THE WASHINGTON UNIVERSITY, Defendant in Error, *v.* EDWARD S. ROWSE, Collector of the Revenue of St. Louis County, Plaintiff in Error.

1. *Laws exempting Lands from Taxation — Their effect.* — An act, without any consideration passing between the parties, providing that lands never should be taxed, would have only the force and effect of an ordinary law simply exempting them from taxation, which might be repealed by any subsequent Legislature.

2. *Legislature — What laws irrevocable; what not — U. S. Constitution — Construction.* — Each Legislature is alike invested with the general powers of sovereignty. Therefore one cannot pass a law irrevocable or irrepealable in its character unless it has imparted to it something in the nature of a compact or contract which will preserve it inviolate under the inhibition of the national constitution.

3. *Taxation—Laws depriving Legislature of power of; how construed.* — A law which seeks to deprive the Legislature of the power of taxation must be so clear, explicit, and determinate, that there can be neither doubt nor controversy about its terms or the consideration which renders it binding. Every presumption will be made against its surrender, as the power was committed by the people to be exercised, and not alienated.

4. *Corporations — Laws exempting from taxation — Their effect.* — The Legislature may, if there is no prohibition in the organic law to the contrary, exempt a corporation from taxation, but such exemption is in its nature *durante, bene placito,* and revocable by a subsequent act.

5. *Right of Taxation — Incident of popular sovereignty — Implied powers.* — In a representative democracy, the right of taxing the citizen is an inseparable incident of popular sovereignty, and must be preserved unimpaired in order that the revenue and burdens necessary to support the government be not unequally distributed, or onerously imposed on any particular class. It is a branch of the legislative power which always, in its nature, implies not only the power of making laws, but of altering and repealing them, as the exigencies of the State and circumstances of the times may require.

### *Appeal from St. Louis Circuit Court.*

Plaintiff's charter (Adj. Sess. Acts 1853, p. 290) was substantially as follows: "Be it enacted," etc.: "1. Christopher Rhodes," etc., "and their associates and successors, are hereby constituted a body corporate and politic, by the name of The Eliot Seminary, and by that name shall have perpetual succession, and be capable of taking and holding, by gift, grant, devise, or otherwise, and conveying, leasing, and otherwise disposing of, any estate, real, personal, or mixed, annuities, endow-

ments, franchises, and other hereditaments which may conduce to the support of said seminary or to the promotion of its objects. All property of said corporation shall be exempt from taxation; and the sixth, seventh, and eighth sections of the first article of the act concerning corporations, approved March 19, 1845, shall not apply to this corporation.  2. The management of the affairs of this corporation shall be vested in a board of seventeen directors.   The persons herein named shall constitute the first board of directors.  Vacancies occurring in the board by resignation, death, or otherwise, shall be filled by the board.  3. The board of directors shall prescribe the course of instruction in said seminary, and organize the institution under such regulations and provide in such way as they may deem proper for the appointment of its professors, teachers, and other officers, and may make such by-laws and rules as they may deem necessary for the management of the institution."

Plaintiff's charter was amended by an act approved February 12, 1857 (Adj. Sess. Acts 1857, p. 610), which altered the name of the institution to that of The Washington University, and provided, in the second section thereof, as follows: "2. No instruction, either sectarian in religion, or party in politics, shall be allowed in any department of said university; and no sectarian or party test shall be allowed in the election of professors, teachers, or other officers of said university, or in the admission of scholars thereto, or for any purpose whatever."   Section 3 provided for the enforcement of the provision of section 2.

*Clover*, for plaintiff in error.

The Legislature, in 1853, attempted to exempt all property of a corporation, created by the name of the Eliot Seminary, from taxation, and expressly declared that the sixth, seventh, and eighth sections of the corporation law of March 19, 1845, should not apply to it.   The corporation so created is in no manner limited as to the amount of property of any kind, real, personal, or mixed, which it may hold.   Its property, now worth hundreds of thousands of dollars, may in time become swollen to millions; and the corporation claims perpetual exemption from payment of

any portion of the burdens of government, under the theory of an irrepealable contract with it on the part of the State which created it.

I. The only question in this case is, can the exemption prevail against subsequent legislation? Can the General Assembly in 1866 repeal or affect the legislation made in 1853; or, in other words, can the generations of men in political government at this day be circumscribed in their political action by the work of men of an earlier day? The following fundamental propositions are submitted: 1. All property within the limits of a State is subject to taxation. 2. The taxing power is sovereign power. 3. The act of 1855 forever exempting all property of this corporation from taxation cannot be supported. The act is without preamble, and a preamble might state a consideration. The corporation is without an object so far as the acts creating it show any. It is perpetual as to time. It is without limit as to amount of capital to be owned and possessed. There was no purpose in the creation of this corporation, unless we can infer it from the use of the words "Seminary" and "University." The exemption is claimed to be perpetual. A covenant which prevents all future taxation must be void, because every Legislature has a right to determine what property shall be taxed, without regard to what may have been done by a preceding Legislature, and without the power of binding a subsequent Legislature. (3 Pars. on Cont. 543.) The question in this case is novel; because in no other case, so far as known, has a corporation, the creature of a State government, claimed perpetual exemption from all taxation. Here the creature has become greater than the creator. The State may fall, but the corporation is to live forever under the ægis of the federal Constitution. The decisions of the Supreme Court in the cases of the Piqua Branch Bank v. Knoop, 16 How. 369; Dodge v. Woolsey, 18 How. 331, 432; Jefferson Bank v. Skelly, 1 Black, 439, do not touch the point involved.

There was an express payment of a sum of money to Ohio by the banks, or an express agreement to receive a sum of money by Ohio from the banks, which formed the consideration of the contract in these cases; and in any event the banks were of limited

existence; there was a period named for their existence, and the exemption from taxation was temporary—limited by the term of existence of the bank; and the capital was fixed so that the amount of the exemption was definitely known beforehand; all which facts and circumstances might justify the decisions of the court in the above cases, and yet make them of no bearing in the case at bar. The banks did not claim perpetual charters and perpetual immunity, as does this seminary or university.

It is one thing for a State to charter a bank for ten or twenty years, and, for a sum of money, to exempt the property of the bank from further taxation for the period of this ten or twenty years; and quite another to charter a bank forever, unlimited as to capital or time, and, without any consideration whatever or price paid (as was paid in all cases heretofore decided), to exempt all its property acquired and to be acquired by gift, grant, devise, or otherwise, whether real estate, personal estate, mixed estate, or whether annuities, endowments, franchises, or hereditaments, from any taxation. Unquestionably this court ought to decide this act nugatory; if for no other reason, because it was and is a fraud upon the body politic, perpetrated by the agent — the General Assembly—upon the constituent — the people at large. (3 Pars. on Cont. 543.)

II. In the case of this corporation no presumption ought to be made in its favor that the exemption is a perpetual one, for the language of the charter does not so declare, and it ought to be construed as a charter of exemption during the pleasure of the State, and no longer. (Christ Church v. Philadelphia, 24 How. 300; Commonwealth v. Bird, 12 Mass. side p. 442; Dale v. Governor, 3 Stew. 387; Alexander v. Willington, 2 Russ. & M. 35; 12 Harris, 232; Lindley's Jurisp. § 42.)

III. The acts do not make or express a contract. There was no consideration moving to the State, either pecuniary or valuable, nor does the Legislature seem ever to have contemplated the idea of a consideration to the contract. Chief Justice Marshall, in the Dartmouth College case, says: "The objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country, and this

benefit constitutes the consideration, and in many cases the sole consideration, of the grant." This is certainly only partial truth, and not whole truth. It is in one sense true that the objects for which a corporation is created are such that the government wishes to promote them, else the government would not incorporate; but that charters are granted because deemed beneficial to the State may have been true in the time of Judge Marshall, but was not true when the Eliot Seminary was chartered, and is not true now. From a consideration of the charter itself, what benefit is supposed to have accrued to the State by the act to incorporate the Eliot Seminary? A seminary of what? Whether of religion or free thought, of vice or goodness, of learning or gymnastics, does not appear. For charter of the Eliot Seminary, *vide* Sess. Acts of 1853, pp. 290–1; and for amendatory act, Sess. Acts of 1856, pp. 610–11.

*Wingate*, for plaintiff in error.

I. Under our frame of government, the power of taxation is essential to its existence, and is one of the incidents of sovereignty inherent in the people, not to be abridged by the Legislature in exclusion of its succeeding action. Neither a Legislature nor a convention of the people can extinguish an essential right of sovereignty. Another convention may declare otherwise, or another Legislature repeal the exemption. If the Legislature, without the authority of the constitution, may exempt one kind of property from taxation, it may exempt all; and if the Legislature may exempt all property from taxation beyond its future, control, the government contains within its own organization the elements of its own destruction.

II. An exemption from taxation is not a contract in the sense of the constitution. A consideration, one of the necessary requirements to constitute a contract, is wanting, for nothing can compensate for the yielding of a sovereign right upon which the government must depend for existence.

III. The words of the act in question do not create a perpetual exemption from taxation, and, to give them such a construction, resort must be had to inference or presumption arising from the

language employed, which cannot be relied upon to abridge the powers of legislation touching the surrender of a sovereign right of the people. (1 New Am. Law. Reg. 718; Adj. Sess. Acts 1853, p. 49; Blackw. on Tax Tit. 478–82; Const. Mo. art 11, § 16; Gen. Stat. 1865, p. 95, §1.)

*Hitchcock*, for defendant in error.

I. The State may make a contract not to exercise the taxing power, or to exercise it only within certain limits, with respect to a particular subject; and such a contract once made cannot be rescinded by a subsequent legislative act. (Jefferson Branch Bank v. Skelly, 1 Black, 436, 448; New Jersey v. Wilson, 7 Cranch, 164.) The only qualification to the above is that such a contract by a State will not be implied, but must appear in express terms. (Gordon v. Appeal Tax, 3 How. 133, cited; 1 Black, 446.) But when the purpose to exempt from taxation appears in express terms in the charter, the uniform ruling of the United States Supreme Court has always been " that State legislatures, unless prohibited in terms by State constitutions, may contract by legislation to release the exercise of the power of taxing a particular thing, a corporation, or person, as that may appear in its act, and that the contrary has not been open to inquiry or argument in the Supreme Court of the United States." (Per Wayne, J., in Jefferson Br. Bk. v. Skelly, 1 Black, 448; Piqua Br. St. Bk. Ohio v. Knoop, 16 How. 369; Const. U. S. art. 1, § 10; Fletcher v. Peck, 6 Cranch, 87; New Jersey v. Wilson, 7 *id*. 164; Ferrett v. Taylor, 9 *id*. 43, 292; Dartmouth Col. v. Woodward, 4 Wheat. 518; Providence Bk. v. Billings, 4 Pet. 559; Gordon v. Appeal Tax Ct., 3 How. 133; West Riv. Br. Co. v. Dix, 6 *id*. 531, 536, 539, 542; Woodruff v. Trapnall, 10 *id*. 204, 208, 214; E. Hartford v. Hartford Br., 10 *id*. 535; Ohio L. I. & T. Co. v. Debolt, 16 How. 429; Mech. & U. Bk. v. Debolt, 18 *id*. 380; Bridge Pr. v. Hoboken Co., 1 Wall. 116; 16 How. 387, 388; Sturgis v. Crowninshield, 4 Wheat. 122; McCulloch v. Maryland, 4 *id*. 316; Chas. Riv. Br. v. Warren Br., 11 Pet. 540, 611; Planters' Bk. v. Sharp, 6 How. 318; Paup. v. Drew, 10 *id*. 218; Balt. & S. R.R. Co. v. Nesbit, 10 *id*. 395; Piqua Br. St. Bk. Ohio v.

Knoop, 16 *id*. 388 ; Dodge v. Woolsey, 18 *id*. 331, 360 ; Jefferson Br. Bk. v. Skelly, 1 Black, 431, 446 ; The Binghampton Br., 2 Wallace, 52 ; Von Hoffman v. Quincy, 4 Wallace, 535.) Nothing in the Constitution of Missouri which was in force in 1853 and 1857 interferes even indirectly with the power of the General Assembly of Missouri to make such a contract. The only prohibition of any description whatever upon the exercise of legislative power which is contained in that Constitution is in § 26 of art. 3, R. C. 1855, vol 1, p. 69, and relates solely to the question of emancipation and to the introduction of slaves into this State.

II. An express stipulation for a release or exemption from taxation, either in whole or in part, contained in a charter of incorporation, is a contract between the State and the corporation, "within the meaning, and entitled to the protection, of the Constitution of the United States, against any law of the State impairing its obligation ; " and any legislative act which assumes the right to impose any tax in contravention of such stipulation is "unconstitutional and void." (Per Wayne, Justice Supreme Court, 1 Black, 448, citing Piqua Branch, etc. v. Knoop, 16 How. 369 ; Providence Bank v. Billings, 4 Pet. 561, as explained and commented on, 16 How. 388, 391.) A grant is an executed contract, and implies a continuing obligation on the part of the grantor to do nothing inconsistent with the enjoyment by the grantee of the thing granted, in accordance with the tenor of the grant. (Per Marshall, J., in Fletcher v. Peck, 6 Cranch, 136.) The adoption of a new State constitution makes no difference in the application of these principles. (Dodge v. Woolsey, 18 How. 331, 360 ; so per Taney, C. J., in Ohio L. I. & T. Co. v. Debolt, 16 How. 429.)

III. The exemption from taxation in plaintiff's charter is in express terms, and is contained in the original charter. The exemption is not a subsequent additional privilege conferred without consideration. The charter of the Home of the Friendless is upon a similar footing in this respect. (See charters in full; Adj. Sess Acts 1853, p. 50, charter of Home of the Friendless ; *id*. 1853, p. 290, and *id*. 1857, p. 610, charter of Washington

University.) These corporations are both private and elemosynary in their character. On their face appear valid considerations of great benefit to the public, which the State might well recognize and accept as sufficient and valid considerations for the exemptions. On the faith of this contract large sums of money and property have, as alleged in the bill in each case, been donated by charitable persons to each corporation. To subject this property to taxation would be to lessen its actual value to the corporation and to diminish the value of the franchise itself. This falls most directly within the construction uniformly placed by the United States Supreme Court on the constitutional prohibition against "impairing the obligation of contracts." Any contract, therefore, which proposes to do this, is simply void. (Cases above cited.)

IV. If the constitutional prohibition of any exemption from taxation (Const. Mo. 1865, art. 4, § 27 ; Gen. Stat. 1865, p. 32), and the act for the collection of the revenue (Gen. Stat. 1865, chaps. 12 and 13, pp. 98, 133) under which the sale is attempted, therefore are void, so far as the property of these plaintiffs is concerned, it follows that all the acts and proceedings had under them against plaintiffs or their property, no matter by whom, are simply void, and have no lawful basis or authority whatsoever. This applies equally to — 1. The assessment of this property. 2. The judgment or order by the County Court. 3. The advertisement for sale by the collector. All these steps are *ab initio usque ad finem*, and equally without authority of law.

WAGNER, Judge, delivered the opinion of the court.

The question involved relates to the power of the State to assess, levy, and collect a tax on the property owned by the defendant in error. In 1853 the Legislature incorporated the Eliot Seminary, and provided that the incorporators, their associates and successors, should be constituted a body corporate and politic, by the name of The Eliot Seminary, and by that name should have perpetual succession, and be capable of taking and holding, by gift, grant, devise, or otherwise, and conveying, leasing, or otherwise disposing of, any estate, real, personal, or

mixed, annuities, endowments, franchises, and other hereditaments which might conduce to the support of the said seminary or the promotion of its objects; that the property of the said corporation should be exempt from taxation; and that the sixth, seventh, and eighth sections of the first article of the act concerning corporations, approved March 19, 1845, should not apply to it. (Adj. Sess. Acts 1853, p. 290.)

The Legislature, by an amendatory act in 1857, changed the name of The Eliot Seminary to that of The Washington University. (Adj. Sess. Acts 1857, p. 610.)

The seventh section of the general corporation law of 1845 provided that the charter of every corporation that should be thereafter granted by the Legislature should be subject to alteration, suspension, and repeal, in the discretion of the Legislature. When the law was passed granting the charter, there was no express prohibition restraining the Legislature from exempting property from taxation; but by the present constitution it is declared that "no property, real or personal, shall be exempt from taxation, except such as may be used exclusively for public schools, and such as may belong to the United States, to this State, to counties or to municipal corporations within this State." In pursuance of this clause of the constitution, the Legislature passed a law for the assessment and collection of the revenue, by virtue of which the property of the defendant in error was subjected to taxation. It is now insisted that the charter was an irrepealable contract, and perpetually exempted the property of the corporation from taxation.

The charter is unusual and of marked peculiarity. There is no preamble to the act, and no limit to its duration or to the amount of property which it may hold. No obligations are cast upon the corporation; it stipulates for nothing, and agrees to give no consideration whatever for the extraordinary privileges thus granted. The intention was, we suppose, to establish an institution of learning, but there is nothing to prevent the corporation from accumulating and absorbing millions of wealth, and there is no corresponding obligation imposed to compel it to carry out any contemplated object. To determine correctly this question it is

of the utmost importance that we arrive at a just conclusion in regard to the nature of the act. If it be indeed a contract, it must stand, and the State is bound by it, however inexpedient or injudicious it may have been when made. By the constitution of the United States no State can pass any law impairing the obligation of contracts. There is no prohibitory clause in the constitution which has given rise to more protracted litigation, and various and profound discussion, than the one above quoted. The counsel for the defendant in error has cited numerous adjudged cases from the decisions of the Supreme Court of the United States, and contends that they are conclusive and uncontrollable authority here. If they are upon the same point, and pass on the question presented in this case, they must be considered as decisive, for it appropriately belongs to that tribunal to put a final construction on the national constitution. It may be advantageous to examine some of the cases on this subject decided by the Supreme Court of the United States, and compare them with the case we are now considering, that we may ascertain what effect those decisions should have in the present instance.

The first case of this kind which came before that court, and where the subject received a very thorough discussion, was the celebrated one of Fletcher v. Peck, 6 Cranch, 87. There, the Legislature of Georgia, by an act of the 7th of January, 1795, authorized the sale of a large tract of wild land, and a grant was made by letters patent, in pursuance of the act, to a number of individuals, under the name of the Georgia Company. Fletcher held a deed from Peck for a part of this land, under a title derived from the patent, by which deed Peck had covenanted that the State of Georgia was lawfully seized when the act was passed, and had a good right to sell, and that the letters patent were lawfully issued, and that the title had not since been legally impaired. The action was for breach of covenant; and the breach assigned was that the letters patent were void, for that the Legislature of Georgia, by the act of the 13th of February, 1796, declared the preceding act to be null and void, as being founded in fraud and corruption. This directly brought before the court the question whether the Legislature of Georgia could constitutionally repeal

21—VOL. XLII.

the act of 1795 and rescind the sale made under it. The court declared that when a law was in its nature a contract, and absolute rights have vested under that contract, a repeal of the law could not divest those rights, nor annihilate or impair the title so acquired. A grant was a contract within the meaning of the constitution. The words of the constitution were construed to comprehend equally executory and executed contracts, for each of these contain obligations which are binding on the parties. A grant is a contract executed, and a party will always be held to be estopped by his own grant. A party cannot pronounce his own deed invalid, whatever cause may be assigned for its invalidity, even though that party be the Legislature of the State. It was accordingly held that the State of Georgia having parted from the estate of the land, and that estate having passed into the hands of a *bona fide* purchaser for a valuable consideration, that State was constitutionally disabled from passing any law whereby the estate of the plaintiff could be legally impaired and rendered void. No one could for a moment entertain a doubt about that being a case of contract. The State of Georgia had sold the land for a valuable consideration, and conveyed it by deed to the purchasers. The title was actually vested in the grantees, and the contract executed. But had it been only executory, it would have been equally obligatory. Had the purchaser agreed at a future day to pay, and the State in consideration thereof agreed to convey the lands, there could have been very little dispute about its being a contract. The only questions involved in the case were, does the constitutional provision extend to contracts made by States? and has a State, being a party to a contract, a right to declare that contract void, for fraud committed by its own government in the execution of that contract upon the rights of those it represented?

The case of The State of New Jersey v. Wilson (7 Cranch, 164) is similar to that of Fletcher v. Peck in its principles. There, in consideration that the Delaware Indians released to the State of New Jersey their right to certain lands, the Legislature declared by law that other lands purchased for the Indians should not be subject to taxation. The Indians subsequently, with the consent of the Legislature, sold the lands thus acquired; and the Legisla-

ture, by subsequent enactment, imposed a tax on those lands. This was determined by the Supreme Court of the United States to be in violation of the contract made with the Indians, the benefits of which accompanied the title, and therefore void. Chief Justice Marshall, in delivering the opinion of the court, says: " Every requisite to the formation of a contract is found in the proceedings between the then colony of New Jersey and the Indians. The subject was a purchase, on the part of the government, of extensive claims of the Indians, the extinguishment of which would quiet the title to a large portion of the province. A proposition to this effect is made, the terms stipulated, the consideration agreed upon, which is a tract of land with the privilege of exemption from taxation; and then, in consideration of the arrangements previously made, one of which this act of assembly is stated to be, the Indians execute their deed of cession. This is certainly a contract clothed in forms of unusual solemnity."

The question to be considered was, did the Legislature pass the act exempting the lands from taxation as an ordinary law, or was it a contract between the parties? It certainly possessed every element of a contract between parties making a mutual agreement. But had the Indians parted from nothing, and the Legislature enacted simply that their lands should be exempt from taxation, would that have constituted a contract, and could not a subsequent Legislature have repealed the statute and imposed a tax upon the land? I think nothing could be plainer. The Legislature cannot, by declaring an act perpetual, render it so.

An act, without any consideration passing between the parties, providing that lands never should be taxed, would have only the force and effect of an ordinary law simply exempting them from taxation, which might be repealed by any subsequent Legislature.

The case of Dartmouth College v. Woodward (4 Wheat. 518) is a leading case, and is usually cited as containing a most full and elaborate discussion of the principles contended for in this case. In the investigation of the Dartmouth College case, the inhibition on the States to impair by law the obligation of contracts received the most thorough and exhaustive examination, and the great influence of the authoritative adjudication then made has remained

unimpaired to the present day.   Dartmouth College was incorpo-rated by a charter from the King of Great Britain, in 1769.   The Legislature of New Hampshire, by act of assembly, undertook to vary the charter in essential points ; to institute a number of additional visitors ; and, in fact, to exercise a complete control over it.   Marshall, C. J., declares that " the charter was a con-tract to which the donors, the trustees of the corporation, and the crown, were the original parties, and it was made on a valuable consideration for the security and disposition of property."   The act of the State there, which was complained of, transferred the whole power of governing the college from the trustees appointed in accordance with the will of the original founder, as expressed in the charter, to the Executive of New Hampshire.   The charter was reorganized so as to entirely wrest the corporation from the management and control of the trustees appointed according to the will of the original founders, and converted it into a machine wholly subservient to the State government.   This, of course, was entirely subversive of the contract under which the donors invested their property.

In Gordon v. Appeal Tax Court, 3 How. 133, it was held that where the Legislature of a State accepted from banking corpora-tions a bonus as a consideration for the franchise granted, and pledged the faith of the State not to impose any further tax or burden upon them during the continuance of their charters under the act, a tax upon the stockholders, by reason of their stock, was a violation of the contract, and illegal.   The same point was ruled in the series of cases growing out of the laws of Ohio creat-ing their banking system.

In 1845 the Legislature of Ohio passed a general banking law, the fifty-ninth section of which required the officers to make semi-annual dividends ; and the sixtieth required them to set off six per cent. of such dividends for the use of the State, which sum or amount so set off should be in lieu of all taxes to which the com-pany or the stockholders therein would otherwise be subject.   In 1851 an act was passed entitled " An act to tax banks, and bank and other stocks, the same as property is now taxable by the laws of this State."   The operation of the latter law was to increase

the tax.    The Supreme Court of Ohio upheld the law, and declared in favor of its validity, but the Supreme Court of the United States reversed the decision of the State court, on the ground that the first law was a contract founded on a consideration, and that it could not be violated.    (Piqua Branch of the State Bank of Ohio v. Knoop, 16 How. 369; Dodge v. Woolsey, 18 How. 331.)    The Supreme Court of Ohio refused to follow the above decisions, and the question was again brought before the national tribunal, where the prior rulings were affirmed, and it was distinctly announced that a State, in chartering a corporation, might, in express terms, and for a *consideration*, contract that the corporation should be exempt from taxation, and that a contract so made was protected from subsequent legislation. (Jefferson Branch Bank v. Skelly, 1 Black, 436.)

In all the cases decided by the Supreme Court of the United States, from the very earliest period down to the two recent decisions of Bridge Prop. v. Hoboken (1 Wall. 116), and the Binghampton Bridge (3 Wall. 52), it is believed a valid consideration was paid in every instance in which we find judgments of that court invalidating a law of the State intended to abrogate a right vested under a previous statute.    The right of taxation, like the right of eminent domain, is a high prerogative of sovereignty, and ought never to be surrendered.    "That the taxing power is of vital importance," said Chief Justice Marshall, in the case of the Providence Bank v. Billings, 4 Peters, 561–2, "that it is essential to the existence of government, are truths which it can not be necessary to reaffirm.    They are acknowledged and asserted by all.    It would seem that the relinquishment of such a power is never to be assumed.    We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear."    And again: "The power of legislation, and consequently of taxation, operates on all persons and property belonging to the body politic.    This is an original principle, which has its foundation in society itself.    It is granted by

all, for the benefit of all. It resides in government as a part of itself, and need not be reserved when property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burdens, and that portion must be determined by the Legislature."

In Brewster v. Hough (10 N. H. 139) the court denies absolutely that the State, acting through its Legislature, can surrender any portion of the taxing power. The Judge remarks: "The power of taxation is essentially a power of sovereignty or eminent domain, and it may well deserve consideration whether this power is not inherent in the people under a republican government, and so far inalienable that no Legislature can make a contract by which it can be surrendered without express authority for that purpose in the constitution, or in some other way leading directly from the people themselves." This case was referred to and received the unqualified assent of Mr. Justice Daniel in his dissenting opinion in the Piqua Branch, etc., v. Knoop. Professor Greenleaf, under the head of franchise, in his edition of Cruise, notices the case of Brewster v. Hough, and observes: "In regard to the position that the grant of a franchise of a ferry, bridge, turnpike, or railroad, is in its nature exclusive, so that the State cannot interfere with it by the creation of another similar franchise tending materially to impair its value, it is with great deference submitted that an important distinction should be observed between those powers of government which are essential attributes of sovereignty, indispensable, to be always preserved in full vigor—such as the power to create revenue for public purposes, to provide for the common defense, to provide safe and convenient ways for the public necessity and convenience, and to take private property for public uses, and the like — and those powers which are not thus essential, such as the power to alienate the lands and other property of the State, and to make contracts of service, or of purchase and sale, or the like. Powers of the former class are essential to the constitution of society, as without them no political community can well exist, and necessity requires

that they should continue unimpaired. They are intrusted to the Legislature to be exercised, not to be bartered •away, and it is indispensable that each Legislature should assemble with the same measure of sovereign power which was held by its predecessors. Any act of the Legislature disabling itself from the future exercise of power intrusted to it for the public good must be void, being in effect a covenant to desert its paramount duty to the whole people." (3 Greenleaf's Cruise, tit. 27, § 29, note.)

It is an admitted principle in our republican government that one Legislature cannot in any manner abridge or lessen the power of a succeeding Legislature. Each is alike invested with the general power of sovereignty. Therefore one Legislature cannot pass a law irrevocable or irrepealable in its character unless it has imparted to it something in the nature of a compact or contract which will preserve it inviolate under the inhibition of the national constitution. A law which seeks to deprive the Legislature of this inherent and vital principle of sovereignty — the power of taxation — must be so clear, explicit, and determinate, that there can be neither doubt nor controversy about its terms or the consideration which renders it binding. Every presumption will be made against its surrender, as the power was committed by the people to the government to be exercised, and not to be alienated. (The People v. Roper, 35 N. Y. 629 ; Mott et al. v. The Penn. R.R. Co., 6 Casey, 9 ; Commonwealth v. Bird, 12 Mass. 442.)

Because the Legislature sees fit to grant certain privileges and immunities to a person, it does not follow that they are to be perpetual, and that the law cannot be repealed. The legislative power may enact that an informer shall have a certain interest in a penalty, yet, after information given, the law may be repealed and his interest will be destroyed. (10 Wheat. 248 ; 6 Pet. 404.) The Legislature may, if there is no prohibition in the organic law to the contrary, exempt certain species of property from taxation, yet they would be at liberty at any time to repeal the exemption and again subject it to the burdens of government. This power ought not to be questioned or doubted ; but the opinion seems to prevail with some minds that the right of property is more sacred in chartered corporations than the same right is in the person of

the citizen — a doctrine which I regard as wholly fallacious and indefensible. It is a noticeable fact that in earlier days the courts were strongly in favor of corporations, and the reason was obvious — they were few, a strong prejudice existed against them, the Legislatures were constantly encroaching upon them, and they required protection. Now the reverse is true. They have become so numerous and powerful that they overshadow almost everything in the land; nearly every man is some way interested in them, and the Legislature needs protection against their exactions, demands, and importunities. Had the grant exempting the property of the defendant in error from taxation been made to an individual in the same terms, I do not think it would be for a moment contended that the grant was not repealable, and that the State did not possess the unquestioned right to resume the taxing power at pleasure. Can it make any difference because it was made to a corporation? It seems to me that the case of Christ Church v. Philadelphia (24 How. 300) is entirely similar in principle to the case at bar, and conclusive authority — where it was held that an exemption from taxation contained in the charter of a corporation granted by the State was in its nature *durante, bene placito*, and revocable by subsequent act. It appears from the report that, in the year 1833, the Legislature of Pennsylvania passed an act which recited "that Christ Church Hospital, in the city of Philadelphia, had for many years afforded an asylum to numerous poor and distressed widows who would probably else have become a public charge; and, it being represented that in consequence of the decay of the buildings of the hospital estate, and the increasing burdens of taxes, its means were curtailed and its usefulness limited," they enacted "that the real property, including ground rents, now belonging and payable to Christ Church Hospital, in the city of Philadelphia, so long as the same shall continue to belong to the said hospital, shall be and remain free from taxes."

In the year 1851 the same authority enacted "that all property, real and personal, belonging to any association or incorporated company which is now by law exempt from taxation, other than that which is in the actual use and occupation of such association

or incorporated company, and from which an income or revenue is derived by the owner thereof, shall hereafter be subject to taxation in the same manner and for the same purposes as other property is now by law taxable, and so much of any law as is hereby altered and supplied be and the same is hereby repealed." It was decided in the Supreme Court of Pennsylvania that the exemption conferred upon the plaintiffs by the act of 1833 was partially repealed by the act of 1851, and that an assessment of a portion of their real property under the act of 1851 was not repugnant to the constitution of the United States as tending to impair a legislative contract which they alleged to be contained in the act of Assembly of 1833. The United States Supreme Court say: "The plaintiffs claim that the exemption conceded by the act of 1833 is perpetual, and that the act itself is in effect a contract. This concession of the Legislature was spontaneous, and no service or duty or other remunerative condition was imposed on the corporation. It belongs to the class of laws denominated *privilegia favorabilia*. It attached only to such real property as belonged to the corporation and while it remained as its property; but it is not a necessary implication from these facts that the concession is perpetual or was designed to continue during the corporate existence." And it is further added: "It is in the nature of such a privilege as the act of 1833 confers that it exists *bene placitum*, and may be revoked at the pleasure of the sovereign." This decision was made by an unanimous bench, subsequent to the Ohio case in which three judges dissented, and shows most clearly that a grant of the nature of the one which we are now considering was not regarded in the light of a contract.

No importance or weight can be attached to that provision of the charter of defendant in error which excludes it from the operation of the seventh section of the general law in relation to corporations. It is incompetent, as before observed, for one Legislature to attempt to derogate from the power or tie up the hands of a subsequent Legislature. For an irrepealable contract of the character here presented no authority or precedent is to be found. Whilst the exemption continued, the property was free from taxa-

tion; but when the law was repealed, it then fell back in the general mass — liable, like all other property, for the burdens of government. It has been truly said that "in a representative democracy the right of taxing the citizen is an inseparable incident of popular sovereignty." And this right must be preserved unimpaired in order that the revenue and burdens necessary to support the government be not unequally distributed or onerously imposed on any particular class. The rights and obligations of the citizen and the government are mutual and correlative; the one owes the duty of allegiance, the other of protection. Whilst protection is held out and extended, the necessary support for the government must be furnished. Giving away the taxing power in perpetuity inevitably tends to the destruction of the State. If ten millions can be released in one day, one hundred millions may be released in another; and, the principle being once established, the process might go on till every resource of revenue was gone. Although the taxing power is but an incidental one, to be exercised as the means of performing governmental functions, it is nevertheless a branch of the legislative power, which always, in its nature, implies not only the power of making laws, but of altering and repealing them as the exigencies of the State and circumstances of. the times may require. (Rutherford's Inst. of Nat. Law, book 3, ch. 3, § 3.)

When the charter of the University was granted, the Legislature might have considered it reasonable to foster and encourage it in its infancy and confer upon it privileges and immunities while struggling into existence. But no provision is made in express terms, or by reasonable intendment, that those immunities should be perpetual and have the effect of withdrawing millions of subsequently acquired property from taxation. In 1853 taxes were light and the State debt was small, and exemptions could be made without great detriment. After that period the State embarked in a false and ruinous system of loaning its credit to corporations, by which it incurred an immense debt; then followed the civil war, which increased its already burdensome obligations, and taxation became exceedingly onerous.

In this condition of things it was deemed the part of wisdom

to make all property within the jurisdiction of the State, receiving the benefit of her laws and protection, contribute its proper proportion and share the common burdens. This was entirely a matter resting in the sound discretion of the legislative branch of the government, and we have been unable to find any objection to their exercise of the power.

The judgment will be reversed and the petition dismissed. The other judges concur.