THE WASHINGTON UNIVERSITY v. W. F. BAUMANN, Collector of the City of St. Louis, Appellant.—108 S. W. (2d) 403.

Court en Banc, July 30, 1937.

*Charles M. Hay, J. W. McAfee* and *John G. Burkhardt* for appellant.

*Charles P. Williams* for respondent.

ELLISON, J.—This is an appeal by the Collector of the City of St. Louis from a decree of the circuit court of that city granting the respondent, The Washington University, a perpetual injunction restraining him and his subordinates from seizing, offering for sale, or

selling some sixty-two lots or parcels of its real estate for State, city and school taxes aggregating $183,003.77, assessed June 1, 1931, and due December 31, 1932, and from otherwise attempting to collect said taxes, on the ground that the corporate charter of the University exempts all its property from taxation. The injunction suit was originally brought against Edmond Koeln, the then collector of St. Louis. Since this appeal was lodged here his successor in office, W. F. Baumann, has been substituted as appellant. We shall refer to him as the Collector and to the respondent as the University.

The University's petition below alleged and the evidence showed that it was incorporated on February 22, 1853, under the name "the Eliot seminary" by special act of the General Assembly, Laws 1852-3, page 290, section 1 of which provided that: "(the named corporators) and their associates and successors are hereby constituted a body corporate and politic, by the name of 'the Eliot seminary,' and by that name shall have perpetual succession, and be capable of taking and holding by gift, grant, devise or otherwise, and conveying, leasing, or otherwise disposing of any estate, real, personal or mixed, annuities, endowments, franchises and other hereditaments which may conduce to the support of said seminary, or to the promotion of its objects; *all property of said corporation shall be exempt from taxation,* and the sixth, seventh and eighth sections of the first article of the act concerning corporations, approved March 19, 1845, shall not apply to this corporation." (Italics ours.)

The seventh section of the first article of the act concerning corporations (R. S. 1845, Chap. 34, p. 232) from the application of which the University was exempted by the above special act, provided that the charter of every corporation thereafter granted by the Legislature should be subject to alteration, suspension and repeal in the discretion of the Legislature. The State Constitution of 1820, in force at that time, imposed no limitations on the legislative power to enact local or special laws, or laws granting exemption from taxation.

The aforesaid special Act of 1853 was amended by Laws 1857, page 610. Section 1 of the latter act provided: "The name of the corporation now known as 'The Eliot Seminary,' shall henceforth be 'The Washington University,' by which name the said corporation shall have, hold and enjoy all the property, rights, franchises, endowments, immunities and privileges conferred upon and belonging to the Eliot Seminary." Section 2 of the act forbade instruction either sectarian in religion or party in politics in any department of the University; and likewise prohibited the application of such tests in the selection of the faculty and officers or the admission of students, or for any purpose whatever. The University accepted and ever since has operated under that amended charter.

Eight years later the State Constitution of 1865 was adopted. Section 27, Article IV thereof provided: ''The general assembly shall not pass special laws . . . exempting any property of any named person or corporation from taxation.'' And Section 16 of Article XI declared: ''No property, real or personal, shall be exempt from taxation, except such as may be used exclusively for public schools, and such as may belong to the United States, to this State, to counties, or to municipal corporations, within this State.''

Shortly following the adoption of this (then) new Constitution, in 1866 certain real estate of the University was assessed for taxation, and Edward S. Rowse, collector of the revenue of St. Louis County, took steps to collect the taxes. The University brought a suit to enjoin him therefrom on the same ground urged in the instant suit, namely, that by virtue of its charter the real estate was exempt from taxation. The collector demurred to the bill and, his demurrer being overruled, declined to plead further. The Circuit Court of St. Louis County thereupon granted to the University a perpetual injunction. The case was brought to this court by writ of error, and is reported as Washington University v. Rowse, 42 Mo. 308.

The opinion reviewed at some length a number of decisions of the United States Supreme Court, such as Dartmouth College v. Woodward, 17 U. S. (4 Wheat.) 518, 4 L. Ed. 629, and acknowledged them as controlling authority on questions arising under Section 10, Article I, Constitution of the United States, which provides that no state shall pass any law impairing the obligation of contracts. But it endeavored to distinguish all those cases on the ground that there was no *consideration* for the grant of immunity from taxation contained in the University's charter, and therefore no contract. It conceded, further, that the Legislature had the right to grant that exemption in the Acts of 1853 and 1857, since there was then nothing in the State or Federal Constitutions forbidding it, but held that inasmuch as no contractual obligation had been created the people in a subsequent Constitution, and the Legislature by subsequent legislation, could repeal the grant on the theory that ''one Legislature cannot in any manner abridge or lessen the power of a succeeding Legislature.'' The point is stressed that all such grants should be strictly construed against the grantee because ''giving away the taxing power in perpetuity inevitably tends to the destruction of the State;'' especially so where, as in the University's charter, there is no limit to the amount of property that can be acquired. Accordingly, the judgment of the circuit court granting a perpetual injunction was reversed outright and the bill dismissed.

The University took the case to the United States Supreme Court by writ of error. It was decided in 1869, and is reported as The Washington University v. Rouse, 75 U. S. (8 Wall.) 439, 19 L. Ed.

498. The judgment of the Missouri Supreme Court was reversed and the cause remanded with directions to proceed, Mr. Chief Justice CHASE and Messrs. Justices MILLER and FIELD dissenting. The principal opinion by Mr. Justice DAVIS was less than two pages long. It held briefly that the University's charter was a contract and that exemption from taxation was one of the franchises thereunder, of which the University could not be deprived by any species of State legislation. The opinion did discuss one question more fully—the point made in the opinion of the Missouri Supreme Court that the University's charter set no limit on the amount of property it might acquire. Concerning this the decision said:

"It is urged that the corporation, as there is no limit to its right of acquisition, may acquire property beyond its legitimate wants, and in this way abuse the favor of the Legislature, and, in the end, become dangerous, on account of its wealth and influence. It would seem that this apprehension is more imaginary than real, for the security against this course of action, is to be found in the nature of the object for which the corporation was created. It was created specially to promote the endowment of a seminary of learning, and it is not to be presumed that it will ever act in such a manner as to jeopardize its corporate rights; nor can there be any well-grounded fear that it will absorb, in its effort to establish a literary institution of a high order of merit, in the city of St. Louis, any more property than is necessary to accomplish that object. Should a state of case in the future arise, showing that the corporation has pursued a different line of conduct, it will be time enough then to determine the rights of the parties to this contract, under this altered condition of things. The present record presents no such question, and we have no right to anticipate that it will ever occur. It is enough for the purposes of this suit to say, that so long as the corporation uses its property to support the educational establishments for which it was organized, it does not forfeit its right not to be taxed under the contract which the State made with it."

This Washington University case referred to a companion decision in which the controlling opinion, by the same author, was concurrently delivered and said there were no material points of difference between the two. That case also had gone up from St. Louis County to this court and thence to the United States Supreme Court; and involved the right of a charitable corporation to exemption from taxation under a charter practically identical with that of Washington University. [Laws 1852-3, p. 49, sec. 1.] It was Home of the Friendless v. Rouse, 75 U. S. (8 Wall.) 430, 19 L. Ed. 495, 42 Mo. 361. The opinion therein after fuller discussion reached the same conclusion as did the Washington University case. In so doing it dealt with the main point made by this court in the Washington Uni-

versity case, that the charter exemption from taxation was without consideration, saying:

"It is objected that there is no consideration stated in the act for the release from taxation, which it is claimed is necessary in order to uphold the contract. But this is a mistaken view of the law on this subject. There is no necessity of looking for the consideration for a legislative contract outside of the objects for which the corporation was created. These objects were deemed by the Legislature to be beneficial to the community, and this benefit constitutes the consideration for the contract, and no other is required to support it. This has been the well-settled doctrine of this court on this subject since the case of Dartmouth College v. Woodward."

Upon receipt of the mandate of the United States Supreme Court reversing and remanding Washington University v. Rowse, supra, 42 Mo. 308, this court vacated its former judgment dismissing the University's petition therein, and entered a judgment affirming the decree of the circuit court which had granted the University a perpetual injunction. These facts were pleaded and proven in the instant case and the University contends, in part, that they make the question of its charter right to exemption from taxation *res judicata.* The decree of the circuit court, however, does not appear to be based on that ground: it adjudges that the real estate involved is exempt from taxation by virtue of the legislative acts and charter making it so.

The people of this State adopted the present Constitution in 1875, Sections 6 and 7 of Article X of which provide as follows:

"Sec. 6. . . . Lots in incorporated cities or towns, or within one mile of the limits of any such city or town, to the extent of one acre, and lots one mile or more distant from such cities or towns, to the extent of five acres, with the buildings thereon, may be exempted from taxation, when the same are used exclusively for . . . schools . . .; *Provided,* That such exemptions shall be only by general law."

"Sec. 7. . . . All laws exempting property from taxation, other than the property above enumerated, shall be void."

Following this, two statutes were enacted: one being Section 6658, Revised Statutes 1879, now Section 9742, Revised Statutes 1929 (Mo. Stat. Ann., p. 7862), providing, "for the support of the government of the state, the payment of the public debt, and the advancement of the public interest, taxes shall be levied on all property, real and personal, except as stated in the next section;" and the other, next following thereafter, being Section 6659, Revised Statutes 1879, and Section 9743, Revised Statutes 1929 (Mo. Stat. Ann., p. 7863), clause 6 of which provides for the exemption from taxation of school prop-

erty in the exact language of Section 6, Article X of the Constitution, as quoted above.

The University charged in its petition that the foregoing statutory and constitutional provisions are void under Section 10, Article I of the Constitution of the United States, insofar as they purport to impair the obligation of its contract with the State for exemption from taxation, expressed in its charter; that the tax bills issued thereunder cast a cloud upon its title to its land; that it had no adequate remedy at law; and prayed for the injunction aforesaid and for general relief. The Collector filed a demurrer to the petition and a motion to dismiss, and when they were overruled filed answer admitting the incorporation of the University, the ownership of real estate and the levy of taxes thereon as in the petition alleged. Then follows a general denial, an affirmative plea that the land is subject to said taxes "under the constitutional laws" of the State, a plea that a part of said real estate is encumbered by mortgages the security of which cannot legally be enhanced by exemption from taxation, and a plea that the University had an adequate remedy at law, as more fully explained later in this opinion. To this answer the University filed a reply which was a general denial.

The undisputed evidence shows that when The Washington University v. Rouse case was being litigated in the courts of this State and the United States Supreme Court between 1867 and 1871, the University owned only four pieces of income real estate not occupied and directly used for school purposes. The petition describes sixty-two parcels of real estate in St. Louis as being owned by it now. All except one parcel are income property only. The taxing authorities are not attempting to tax many other parcels owned and actually used by it for school purposes. (It appears the University also has substantial real estate holdings in St. Louis County, outside of the city, which have not been taxed.) The evidence treats only of sixty parcels in the city. Of these twenty-eight were gifts; six were obtained in exchange for other real estate; and twenty-six were purchased out of endowment funds and gifts. Ten of these twenty-six parcels were bought for a contemplated addition to the Medical School. The others were not acquired with a view to future occupancy and direct use by the University. It got the great bulk of its real estate in and after 1900. In that year twelve valuable parcels of land were received from Messrs. Samuel Cupples and Robert Brookings, covered by a blanket mortgage to the New York Life Insurance Company for a principal sum slightly exceeding $1,000,000 at the time of trial; but this encumbrance was being paid off at the rate of $50,000 per year. These twelve parcels were producing an income ranging between $335,000 and $392,000 per year, and the Collector made no effort to prove the conveyance thereof to the University, or the mort-

gage thereon, was fraudulently executed. Practically all the sixty parcels of real estate were regarded by the University as being superior to stocks, bonds and real estate mortgages for investment purposes, especially during the period of the depression.

Gifts to the University of more than $25,000 each aggregated $26,-254,104 at the time of trial. This included all sorts of property, real estate, securities, bonds, stocks and cash. There had been other gifts of less than $25,000 each. The income of the University for the year ending June 30, 1932, from investments was $1,345,449.93, and from tuitions and fees $1,137,294.38, a total of $2,482,744.32. The expenses for that year were $2,363,573.55, leaving a balance of $119,170.77. The institution operates under a budget system and surpluses and deficits for any year usually do not exceed $3000. In most of the departments the tuition is $250 a year, and operating expenses run nearly $500 per year per student. In the Medical School the tuition is $400 per year and the University's annual operating cost per student is $1900. In the year 1932-3 scholarship fellowship funds were distributed to students amounting to $40,066; free scholarships amounted to $50,225, and student loans to $18,000. At the time of the trial the University in almost every department felt the need of further funds for expansion, particularly in the Medical School where it was desired to add a psychiatric institution. The number of students in 1930-1 was 7915; in 1932-3, 7313. We do not find any figures for the year 1931-2. In addition to the regular academic departments there are seven professional schools.

The Collector's answer further invoked the provisions of Article 4, Chapter 59, Revised Statutes 1929 (Mo. Stat. Ann., p. 7916), whereof Section 9854, clause 3 (Mo. Stat. Ann., p. 7931), provides the State Tax Commission shall have power "to receive all complaints as to property liable to taxation that has not been assessed, or that has been fraudulently or improperly assessed . . .;" and Section 9855 (Mo. Stat. Ann., p. 7934), further provides that in case it shall "be made to appear to said commission by written complaint of any taxpayer that property subject to taxation has been omitted from said roll, or individual assessments have not been made in compliance with law," the commission may hold a hearing and determine as to the proper assessment. Such complaints must be lodged with the commission before the tax rolls have been delivered to the collector. [Sec. 9855, supra.] It was ruled by this court en banc in Brinkerhoff-Faris Trust & Savings Co. v. Hill, 323 Mo. 180, 19 S. W. (2d) 746 (reversed on other grounds, 281 U. S. 673, 74 L. Ed. 1107, 50 Sup. Ct. 451) that a taxpayer who claims his property has been fraudulently assessed, must exhaust his remedy under these statutes before he can invoke equitable relief by injunction, and a failure to do so is laches. That case has since been followed in Missouri on

the point stated.* It has also been held that when property *within a class* (as, for instance, individual pieces of real estate among the whole number in a county) has been improperly assessed, appeal may be made to the local board of equalization. [State ex rel. Thompson v. Dirckx, 321 Mo. 345, 351, 11 S. W. (2d) 38, 41.] Such a procedure is provided for by the statutes especially applicable to the city of St. Louis, Sections 14709, 14712, Revised Statutes 1929 (Mo. Stat. Ann., pp. 6092, 6094).

The University did not seek this statutory relief before bringing the instant injunction suit. That fact is the main basis of the appellant Collector's defense and complaint here. Four of the five assignments in his brief are not directed to the merits under the evidence, but severally charge the University had an adequate remedy at law under the above statutes and was guilty of laches in failing to resort to it; that a court of equity had no jurisdiction in the first instance; that the taxing authorities have the exclusive initial power to consider and determine annually the question whether the University is entitled to a contractual exemption from taxation; that the assessor acts quasi-judicially. At the outset of his printed argument he says "the question whether or not respondent is entitled to exemption from taxes upon the property in question need not be discussed or decided here."

But he adds another assignment that "the questions involved in this matter are within the jurisdiction of the" taxing authorities, and in his printed argument he refers to the part of The Washington University v. Rouse case quoted supra, where the United States Supreme Court said it was not to be feared the University would *absorb more property than was necessary to establish a literary institution of high merit;* and also said, *"should a state of case in the future arise, showing that the corporation has pursued a different line of conduct, it will be time enough then to determine the rights of the parties to this contract, under the altered condition of things."* The foregoing emphasis is appellant's, and he argues these expressions are authority for the contention that changed conditions or abuse of its charter privileges by the University open the way for the taxing officers to tax its property.

The University in its brief denies the initial power of the State Tax Commission and the St. Louis Board of Equalization to validate taxes levied on property which was legally exempted from taxation under the Constitution of 1820. It contends the provisions of our present

*First Trust Co. v. Wells, 324 Mo. 306, 313-4, 23 S. W. (2d) 108, 111; State ex rel. Thompson v. Collier, 328 Mo. 246, 251-2, 41 S. W. (2d) 400, 402; State ex rel. Thompson v. Jones, 328 Mo. 267, 275, 41 S. W. (2d) 393, 396; Brinkerhoff-Faris Trust & Savings Co. v. Hill, 328 Mo. 836, 42 S. W. (2d) 23; State ex rel. Davis v. Walden, 332 Mo. 680, 688, 60 S. W. (2d) 24, 28; State ex rel. St. Louis v. Caulfield, 333 Mo. 270, 277-8, 62 S. W. (2d) 818, 822; Wright v. St. Louis, 337 Mo. 799, 807, 85 S. W. (2d) 1038.

Constitution and the taxing statutes enacted in pursuance thereof have no application to its land, and argues that these statutes do not even purport to refer thereto, pointing out that Section 9854 (Mo. Stat. Ann., p. 7930), supra, expressly refers only to property *"liable to taxation;"* that Section 9855 (Mo. Stat. Ann., p. 7934), supra, applies only to property *"subject to taxation;"* and that Section 14709 (Mo. Stat. Ann., p. 6092), deals with *"taxable* property." (Italics ours.) In short it maintains that as to it any such proceedings are void and open to collateral attack, at least by injunctive process before the tax is paid; that its growth in size and wealth during the last thirty-seven years has not affected its charter rights to immunity from taxation; and that the St. Louis taxing authorities cannot overrule the United States Supreme Court and "repeal" its charter. It further contends that the tax bills sought to be enjoined cast a cloud upon its title to its land; and that sales thereunder would expose it to a multitude of litigations and cause it irreparable damage.

These opposing views make it necessary to determine the exact questions which the St. Louis taxing authorities are and were called upon to decide. For, while the contentions of both parties are mainly based on propositions of law, yet both descend to particular evidentiary facts in some of their assignments of error and arguments. Furthermore, the rule that a property owner aggrieved by an improper tax assessment cannot go initially in equity when he has a remedy at law by appeal to a statutory revisory body generally is acknowledged to be subject to exceptions depending on the facts. [61 C. J., sec. 1426, p. 1081, sec. 1435, p. 1086.]

Proceeding along the foregoing line of inquiry, it should first be stated the doctrine of The Washington University and Home of the Friendless cases, supra, that contractual exemptions from taxation, granted by statutes which were constitutional when enacted, remain valid and binding under Section 10, Article I of the Constitution of the United States as against subsequent legislation in the jurisdiction, either statutory or constitutional, purporting to forbid or abolish such exemptions—that doctrine, we say, has ever since been adhered to by the United States Supreme Court, though there has been a growing tendency to construe such grants strictly; and it has, of course, always been followed by this court.*

*Scotland County v. M. I. & N. Ry. Co., 65 Mo. 123, 134; The Mechanics' Bank v. The City of Kansas, 73 Mo. 555, 558; State ex rel. Haeussler v. Greer, 78 Mo. 188, 191; State ex rel. Trammel v. The H. & St. J. Ry. Co., 101 Mo. 136, 147, 13 S. W. 505, 507; The President et al. of St. Vincent's College v. Schaefer, 104 Mo. 261, 267, 16 S. W. 395, 396; State ex rel. Dosenbach v. St. Joseph's Convent of Mercy, 116 Mo. 575, 579, 22 S. W. 811; State ex rel. Morris v. Board of Trustees of Westminster College, 175 Mo. 52, 60, 74 S. W. 990, 992; North St. Louis Gymnastic Society v. Hagerman, 232 Mo. 693, 703-4, 135 S. W. 42, 45; State ex rel. Waller v. Trustees of William Jewell College, 234 Mo. 299, 319, 136 S. W. 397, 402.

720

As to the true meaning and effect of the University's charter, it will be remembered it provides the corporation shall "have perpetual succession, and be capable of taking and holding by gift, grant, devise or otherwise, and conveying, leasing, or otherwise disposing of any estate, real, personal or mixed, . . . *which may conduce to the support of said seminary, or to the promotion of its objects*; all property of said *corporation* shall be exempt from taxation." The Act of 1857 changing the name of The Eliot Seminary to The Washington University provided the University "shall have, hold and enjoy all the property, rights, franchises, endowments, *immunities* and privileges conferred upon and belonging to the Eliot Seminary." (Italics ours.)

Construing the charter, the extract from The Washington University v. Rouse quoted earlier herein said it would not be presumed the corporation would ever act in such a manner as to jeopardize its corporate rights;" nor was it to be feared that it would absorb any more property than would be necessary to accomplish the object of maintaining a literary institution of high merit. The opinion went on to say that if a state of case should arise in the future showing the corporation had deviated from that course there would be time enough to determine the rights of the parties. And concluding the court declared: "It is enough for the purposes of this suit to say, that so long as the corporation uses its property *to support the educational establishments for which it was organized*, it does not forfeit its right not to be taxed under the contract which the State made with it."

Considered with its context, the statement in the opinion that it was not to be presumed the corporation would ever act in such a manner as to jeopardize its corporate rights, plainly implies the University's property will remain free from taxation so long as it commits no act *ultra vires* by the acquisition, holding or use of property for some purpose other than the support of the educational establishments for which it was organized. This was more directly held in a similar tax exemption case, Asylum v. New Orleans, 105 U. S. 362, 365-6, 26 L. Ed. 1128, where the same court said: "Undoubtedly, if the corporation should acquire property not needed or used for carrying on the institution, it would be an act outside of the objects and purposes of the charter, and *ultra vires*." And if a determination of that question be prerequisite to an ascertainment of the corporation's liability for taxes the general rule is that it can be raised only by the State in a direct proceeding for that purpose. [51 C. J., sec. 8, p. 313, sec. 18, p. 322; Blair v. Chicago, 201 U. S. 400, 450-1, 50 L. Ed. 801, 26 Sup. Ct. 427; Pittsburg A. & M. Ry. Co. v. Stowe Tp., 252 Pa. St. 149, 161, 97 Atl. 197, 201; Kavanaugh v. St. Louis, 220 Mo. 496, 518, 119 S. W. 552, 558; State ex rel. Donnell v.

Foster, 225 Mo. 171, 192-3, 125 S. W. 184, 189; Estel v. Midgard Inv. Co. (Mo. App.), 46 S. W. (2d) 193, 195 (6).]

As to the use of its property, it is obvious from the provisions of the charter and the explicit declarations in The Washington University case, supra, that the University is not limited to real estate actually occupied and directly used for educational purposes. All that is necessary is that the land be used to *support* its educational establishments. This also was held in the companion Home of the Friendless case where the Supreme Court said that institution's charter was "a contract between the State of Missouri and the corporators that the property given for the charitable uses specified in it, shall, so long as it is *applied* to these uses, be exempt from taxation." (Italics ours.)

This exact question was passed upon in University v. People, 99 U. S. 309, 323-4, 25 L. Ed. 387. In that case the county collector attempted to enforce taxes against 427 parcels of land belonging to Northwestern University, none of which were actually occupied or directly used for educational purposes, but all of which were leased, or held for sale or lease, for its use and support in the accomplishment of the objects contemplated by its charter. The charter provided "that all property, of whatever kind or description, belonging to or *owned* by the *corporation,* shall be for ever free from taxation." The Illinois Constitution in force at the time it was granted authorized the exemption from taxation of such real and personal property "as the General Assembly may deem necessary for school . . . *purposes.*" A later Constitution limited the exemption to such property "as may be *used exclusively* for . . . school . . . purposes." (Above italics ours.) The taxing authorities then undertook to collect the taxes there in controversy. The Illinois Supreme Court conceded the earlier Constitution governed but ruled that even under it the discretion of the General Assembly was restricted to property directly used as an instrumentality for school purposes. The United States Supreme Court held to the contrary, saying:

"The makers of the Constitution . . . said that the Legislature might exempt from taxation 'such property as they might deem necessary' (not for the use of schools, but) 'for school purposes.' The distinction is, we think, very broad between property contributing to the purposes of a school, made to aid in the education of persons in that school, and that which is directly or immediately subjected to use in the school. The purposes of the school and the school are not identical. The purpose of a college or university is to give youth an education. The money which comes from the sale or rent of land dedicated to that object aids this purpose. Land so held and leased is held for school purposes, in the fullest and clearest sense."

In a later case, Chicago Theological Seminary v. Illinois, 188 U. S. 662, 663, 673, 47 L. Ed. 641, 23 Sup. Ct. 386; Id., 189 Ill. 439, 59 N. E. 977; People of Illinois v. Board of Directors of Theological Seminary, 174 Ill. 177, 51 N. E. 198, the plaintiff Seminary's charter provided ''that the property, of whatever kind or description, belonging to or appertaining to said seminary, shall be forever free and exempt from all taxation for all purposes whatsoever.'' (Italics ours.) The Illinois Supreme Court had ruled the institution's real estate not directly occupied and used for school purposes but the income from which was devoted thereto, was subject to taxation. In so holding that court said if the charter had provided property *owned* by the *corporation* (as in the Northwestern University charter, supra) should be exempt from taxation, the provision would have covered all its land, but that since it merely specified property *belonging or appertaining to the seminary,* the charter could under a strict construction be taken to refer only to property occupied by the seminary. The United States Supreme Court refused to overturn this state decision and affirmed the judgment below, three justices dissenting. The charter of Washington University here involved meets that test. Immediately following the provision authorizing the corporation to take and hold any kind of property conducing to the support of the University and the promotion of its objects, it says ''all property of said corporation'' shall be exempt.

In passing, attention should be called to two other cases. In Asylum v. New Orleans, supra, 105 U. S. 362, 26 L. Ed. 1128, the legislative charter of St. Anna's Asylum, a charitable institution in New Orleans, provided that ''all the property, real and personal, belonging to the (asylum) be and the same is hereby exempted from all taxation. . . .'' It was held that this exemption protected from taxation a cotton press assessed at $90,000, the revenues from which were applied to the charitable objects of the institution, two justices dissenting. And in State ex rel. Waller v. Trustees of William Jewell College, 234 Mo. 299, 308, 136 S. W. 397, 398, this court said in answer to the contention that statutes exempting property from taxation should be strictly construed: ''The courts have never been over anxious to apply the rule so as to impose burdens upon religious, scientific, literary and educational institutions. Strict construction has largely been applied to corporations organized for profit and gain, not to corporations performing a public service.''

The University in its brief refers to its immunity from taxation under its charter as a ''franchise,'' citing The Washington University case, supra, and Given v. Wright, 117 U. S. 648, 656, 29 L. Ed. 1021, 6 Sup. Ct. 907, both of which use that term. But in Morgan v. Louisiana, 93 U. S. 217, 223, 23 L. Ed. 860, it was held that

immunity from taxation is not a franchise but merely a personal or corporate privilege which does not pass upon a transfer of the franchises of the corporation except with express statutory sanction. This latter view is now the settled doctrine of the United States Supreme Court: Rochester Railway Co. v. Rochester, 205 U. S. 236, 247-253, 51 L. Ed. 784, 788, 27 Sup. Ct. 469, 472; Wright v. Georgia Railroad & Banking Co., 216 U. S. 420, 432, 54 L. Ed. 544, 30 Sup. Ct. 242. These decisions concede, however, that when by legislative act a corporation is authorized to transfer its privileges and *immunities* to another, its right of exemption from taxation does pass or at least is continued in the transferee. In the instant case when the name of The Eliot Seminary was changed to The Washington University by Laws 1857, page 610, the corporation remained the same, and the act provided it should "have, hold and enjoy all the property, rights, franchises, endowments, *immunities* and privileges conferred upon and belonging to the Eliot Seminary." So it is immaterial whether the transaction be regarded as a transfer of corporate privileges, or whether the right to exemption from taxation be considered a franchise; it was at least an immunity the continued enjoyment of which was vouchsafed by the act.

This brings us to the decisive point in the case. Is it true, as the Collector contends, that the local taxing authorities of St. Louis have the *exclusive* initial right annually to pass upon all the close and intricate questions of law enumerated in the preceding paragraphs; to determine whether the University has been guilty of acts *ultra vires* its charter; to find it has acquired more real estate than it needs for its corporate purposes, and to say which particular tracts among the sixty odd it owns in St. Louis, with perhaps many others in other taxing jurisdictions, are outside the pale; to declare that certain tracts have been mortgaged for the fraudulent purpose of enhancing the security of the mortgage holder; and to designate individual tracts as being subject to taxation because they are not being used for educational purposes? We think not.

This court en banc in Boonville National Bank v. Schlotzhauer, 317 Mo. 1298, 1307, 298 S. W. 732, 734, 55 A. L. R. 489, held that when property has been fraudulently over-assessed the owner's remedy is by injunction against the proper officers to restrain them from collecting so much of the tax as is unlawful.

Two years later the case relied on by the appellant collector, Brinkerhoff-Faris Trust & Savings Co. v. Hill, supra, 323 Mo. 180, 189, 194, 19 S. W. (2d) 746, 749, 751, was decided. In that case the plaintiff bank sought an injunction complaining that its shares of stock had been arbitrarily and fraudulently assessed at 100 per cent of their value, whereas all other property in the township had been assessed at not exceeding 75 per cent of its value, except suckling

animals and poultry which were not assessed at all. The opinion observed that if the plaintiff was entitled to abatement of a portion of the tax on its bank stock because the owners of suckling animals and poultry were not taxed, then it would appear on principle all taxpayers in the State should be entirely relieved of their taxes on like property; and then added, "it seems necessary that we re-chart our course." Following that was the holding that the plaintiff could not maintain its bill in equity because it had an adequate remedy at law by complaining to the State Tax Commission.

But the concluding lines of the decision said: "We do not recede from any of the positions taken in the Schlotzhauer case (supra): we merely supplement its holdings by the further holding that a taxpayer who is aggrieved by a fraudulent assessment of his property is not entitled to relief in a court of equity until he has first exhausted the remedies afforded by the statute." Earlier in the opinion the case conceded the general rule to be that equitable relief will not be denied on the ground that the complainant has an adequate remedy at law unless that remedy be adequate, certain and complete. It declared, however, that "the remedy provided by statute is adequate, certain and complete." But this ruling is authority only as applied to facts similar to those there in judgment. And even it concedes the general jurisdiction of equity in cases of fraud, if the legal remedy is not equally comprehensive. On this latter point this court said in Pocoke v. Peterson, 256 Mo. 501, 519, 165 S. W. 1017, 1022: "To oust jurisdiction in equity the remedy at law must be so complete that it attains the full end and justice of the case, reaching the whole mischief and securing the whole right of the party in a perfect manner at the present time and in the future." [See, also: 1 Story's Equity (14 Ed.), sec. 33, p. 31; 1 Pomeroy's Eq. Juris. (4 Ed.), sec. 176, p. 225, sec. 180, p. 238; Hanson v. Neal, 215 Mo. 256, 279, 144 S. W. 1073, 1080; Schwab v. City of St. Louis, 310 Mo. 116, 125, 274 S. W. 1058, 1060; Crow v. Crow-Humphrey, 335 Mo. 636, 647, 73 S. W. (2d) 807, 812.]

In the instant case the University has a contractual charter with the State, and that contract under the decision of the United States Supreme Court in The Washington University case cannot be impaired by subsequent legislation. It stands superior not only to our present taxing law but even to our Constitution, insofar as they purport to destroy the University's privileges and immunities thereunder, relied on for years by it and at least some of its benefactors, as the evidence shows. To do so would be to commit a fraud. Assuming as we may, for the purpose of testing the University's right to maintain this injunction suit, the truth of the facts alleged or otherwise concededly in the case: that its charter right to immunity from taxation has been violated; that it will be subjected to such

aggressions annually if it pays the taxes exacted; that some sixty odd parcels of its land in St. Louis are and will be affected, of different values and under different uses, and perhaps other tracts in other taxing jurisdictions; that it will be involved in a multitude of litigations which can be obviated by this one proceeding; that a cloud will be cast on its title to its land (on this point see 78 A. L. R. p. 186, note); that it will suffer irreparable injury—certainly all these facts showing several grounds for equitable intervention are sufficient to distinguish this suit from the Brinkerhoff-Faris case, supra.

There is some confusion in the general law regarding the circumstances in which the collection of a tax will be enjoined. [26 R. C. L., sec. 416, p. 461.] A large number of cases dealing with that question, as applied to taxes assessed on exempt property, are reviewed in 84 A. L. R., page 1315, note. Some of them take the view that equity will intervene merely because the property is exempt under the law (not alone when the exemption is contractual;* others proceed on the theory that equitable relief is available when the administrative authorities lack *jurisdiction* to assess and tax property either under the law or under the facts.**) One case holds a tax commission is not empowered to determine a *purely judicial* question to the exclusion of the court (Conn v. Jones, 115 Ohio St. 186, 198, 152 N. E. 897, 900); and another that injunction may be resorted to only "if property is absolutely not taxable under any condition." [North American Old Roman Catholic Diocese v. Havens, 164 Miss. 119, 144 So. 473, 84 A. L. R. 1313.] A few of these cases refer in a more or less casual way to the fact that a ground for equitable relief by injunction existed, such as removing a cloud from the complainant's title to his property. The Federal rule is well established that injunction will be granted only when the case falls within one of the recognized branches of equity jurisdiction and the remedy at law is not plain, adequate and complete. [Lee v. Bickell, 292 U. S. 415, 421, 78 L. Ed. 1337, 54 Sup. Ct. 727; Henrietta Mills v. Rutherford County, 281 U. S. 121, 123, 74 L. Ed. 737, 50 Sup. Ct. 270.]

Questions affecting the public revenue are always delicate. We shall go no further in deciding this case than is necessary to a determination of the issues presented. But we think the evidence abundantly establishes several grounds for equitable relief, and that

---

*1 High on Injunctions (4 Ed.), sec. 530, p. 504; Smith & Funk v. Osborn, 53 Iowa, 474, 5 N. W. 681; City of Staunton v. Mary Baldwin Seminary, 99 Va. 653, 657, 39 S. E. 596, 597; Ryan v. City Louisville, 133 Ky. 714, 718, 118 S. W. 992, 994; Grisard v. Roselawn Cemetery Assn., 92 Colo. 289, 19 Pac. (2d) 766.

**Wytheville v. Johnson, 108 Va. 589, 62 S. E. 328; Pittsburg A. & M. Ry. Co. v. Stowe Tp., supra, 252 Pa. St. 1. c. 155, 97 Atl. 1. c, 199; Elmhurst Fire Co. v. City of N. Y., 123 N. Y. 87, 91, 106 N. E. 920, 922; Cropp v. Walton, 199 Ind. 262, 265, 157 N. E. 275, 276, 53 A. L. R. 1386, 1389; Walter v. Hays, 127 Okla., 123, 260 Pac. 15.

the remedy at law under our statutes is neither plain, adequate nor complete. For these reasons we think the respondent University's bill for an injunction was well brought.

It is not our understanding that the tax statutes of this State have ever been regarded as furnishing the sole and only remedy against void assessments in any and all circumstances, so as to preclude absolutely any resort to equity—either before or after the State Tax Commission was established by Laws 1917, page 542. The Brinkerhoff-Faris case, supra, concedes the jurisdiction of equity where the remedy at law is not adequate, certain and complete. Whether it is or not "is a question of law as applied to a given state of facts," this court en banc said in a recent case, State ex rel. City of St. Louis v. Caulfield, 333 Mo. 270, 280 (7), 62 S. W. (2d) 818, 823 (8). And in Laws 1933, page 425, providing for the foreclosure, sale and redemption of delinquent property, Section 9963 (Mo. Stat. Ann., p. 8007), provides: "No tax authorized by the laws of this state, and which shall be assessed on any property within this state by any officer authorized to make assessments shall be held to be illegal or invalid for want of any matter of form in any proceeding *not affecting the merits of the case, and which shall not prejudice the rights of the party assessed.* And all taxes assessed upon any property in this state shall be presumed to be legally assessed until the contrary is affirmatively shown. . . ." (Italics ours.)

These observations are not to be taken as limiting the effect and authority of the Brinkerhoff-Faris case. We are holding simply that the ruling therein does not mean revisory proceedings before a local board of equalization or the State Tax Commission *always* are the taxpayer's only initial remedy against a void assessment. The decision was influenced largely by the fact that if all discriminatory tax assessments could be enjoined, even where fraud is claimed, the courts might be swamped with such litigation and the collection of the public revenues would be impeded intolerably. But the floodgates will not be opened by allowing it in cases such as this one. There are very few legal entities in this State contractually enjoying immunity from taxation.

We do not pass on the respondent University's assignment that the decision in The Washington University v. Rouse, supra, made its right to exemption from taxation *res judicata,* independent of the merits. The trial court did not so hold and the University has not appealed.

The judgment below is affirmed. All concur, except *Douglas, J.,* not voting because not a member of the court when this cause was submitted.