THE WASHINGTON UNIVERSITY v. H. J. GORMAN, City Treasurer of Kansas City, and FRANK McCABE, City Assessor of Kansas City, Appellants.—153 S. W. (2d) 35.

Division One, June 12, 1941.

Rehearing Denied, July 25, 1941.

*William E. Kemp, Roy B. Cunningham, Elmo B. Hunter* and *Jerry T. Duggan* for appellants.

*R. B. Caldwell, Richard S. Bull, H. M. Noble* and *John W. Oliver* for respondent.

314

 DOUGLAS, J.—This suit was brought to enjoin the treasurer and the assessor of Kansas City from levying and collecting certain real estate taxes on property in that city owned by Washington University of St. Louis under a charter exempting all its property from taxes.

The University's petition alleges that it was incorporated by an Act of the General Assembly on February 22, 1853, as the Eliot Seminary. That Act provided that the incorporators "are hereby constituted a body corporate and politic by the name of 'The Eliot Seminary' and by that name shall have perpetual succession and be capable of taking and holding by gift, grant, devise or otherwise, and conveying, leasing or otherwise disposing of any real estate real, personal or mixed, annuities, endowments, franchises and other hereditaments which may conduce to the support of said Seminary, or to the promotion of its objects; all property of said corporation shall be exempt from taxation and the sixth, seventh and eighth sections of the first articles of the Act concerning corporations, approved March 19, 1845, shall not apply to this corporation." The seventh section of the Act concerning corporations referred to in the above provision of the charter, and declared not applicable, was as follows: "The charter of every corporation that shall hereafter be granted by the legislature, shall be subject to alteration, suspension, and repeal, in the discretion of the legislature." [Chapter 34, *Article I, Section 7, R. S. 1845.] The incorporators named in the act accepted the charter and proceeded to organize Eliot Seminary as a seminary and institution of learning, and the corporation acquired and held property as such and proceeded to carry out the purposes of the charter. On February 12, 1857, the charter was amended by the General Assembly and the name Eliot Seminary was changed to Washington University, by which name the University has since been known. After its founding, the University acquired money and property given to it by various persons in aid of its purposes and has devoted the profit, income and revenue from such property for the carrying on of its educational purposes.

On July 4, 1865, the people of Missouri adopted a new Constitution which provided in Article IV, Section 27 that the General Assembly should not pass special laws exempting any property of any named person or corporation from taxation. Pursuant to this provision the Legislature provided for the taxation of all property belonging to

eleemosynary corporations except that expressly exempt from taxation by the constitutional provisions.

In 1866 Rowse, the collector of revenue of St. Louis County, assessed taxes against the property of the University in St. Louis County. The University enjoined the collection of these taxes, but its action was dismissed by this court (Washington University v. Rowse, 42 Mo. 308). The University appealed from this decision to the United States Supreme Court on the ground that its charter constituted a contract with the State and was protected under Article 1, Section 10 of the Constitution of the United States against any impairment by the State. That court upheld this contention in The Washington University v. Rouse, 75 U. S. 439. This court, in compliance with the mandate from above, set aside its dismissal of the University petition and affirmed the judgment of the trial court granting an injunction in favor of the University.

On October 30, 1875, the people of Missouri adopted a new Constitution which provided, among other things, that "all laws exempting property from taxation, other than the property above enumerated, shall be void." [Art. X, Sec. 7.] In pursuance to the Constitution the General Assembly adopted statutes providing that all property shall be subject to taxation except such as it has exempted. [Secs. 10936-8, R. S. 1939.] The University contends that the constitutional and statutory provisions as applied to it are null and void, as being contrary to and in violation of Section 10, Article I of the Constitution of the United States and that all its property is exempt from tax.

The University further alleges that in 1931 the assessor of the City of St. Louis levied taxes against its property and was attempting to enforce the collection of the same when it brought suit to enjoin the collector from doing so. It obtained a permanent injunction and the collector appealed to this court. We held that all property of the University, whether or not occupied and directly used for educational purposes, was exempt from taxation and that the University's charter was a valid contract with the State of Missouri that could not be impaired by subsequent legislation. [Washington University v. Baumann, 341 Mo. 708, 108 S. W. (2d) 403.]

The University charges that notwithstanding the exemption from taxation of its property the defendants have assessed and are attempting to collect taxes on such property and are about to sell the same for nonpayment of taxes.

Its prayer asks that the property be declared exempt from taxation and the tax bills be held void and that the defendants be restrained from assessing taxes or attempting to collect or enforce the payment of taxes.

The answer challenges the power of the assembly to grant the original charter and the power to exempt, perpetually, the University's

property from taxation. After trial, the court below entered a decree holding that the University's property was not subject to taxation because of the charter exemption and made permanent the temporary injunction previously issued. From this judgment the defendants have appealed.

Appellants' principal contention is that the question whether the University's charter constitutes a contract with the State is again open for determination because of the ruling of Erie Railroad Company v. Tompkins, 304 U. S. 64. They argue that the decision of the United States Supreme Court in the Rowse case, which held that such charter did constitute a contract, and for that reason was entitled to the protection of the Federal Constitution, was founded upon the doctrine announced in Swift v. Tyson, 16 Peters, 1, which permitted Federal Courts to exercise their independent judgment as to what the common law of the State should be, which doctrine is now repudiated by the Erie case. The effect of their argument is that the United States Supreme Court in the ▮▮▮ Rowse case was bound to follow the decision of this court. This argument is irrelevant.

In the first place the doctrine erroneously announced in Swift v. Tyson was completely extraneous to cases arising under the circumstances of the Rowse case. That doctrine had to do with the application of Section 34 of the Federal Judiciary Act of 1789, 28 U. S. C. A., Section 725, which provides: "The laws of the several States, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply." Swift v. Tyson held that Federal Courts exercising jurisdiction on the ground of diversity of citizenship need not, in matters of general jurisprudence, apply the unwritten law of the State as declared by its highest court but that they were free to exercise an independent judgment as to the common law of the State. It is evident that this decision in no way applied to cases to be determined according to the Constitution of the United States. In such cases the act was not applicable. The decision in the Erie case conforms to the act for it states: *"Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. And whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law."* (Our italics.)

A review of the two decisions in the University's case against Rowse also dispels this contention. Our opinion in that case recognized that the question to be decided was whether the charter granted by the assembly to the University amounted to a contract because we said: "if it be indeed a contract, it must stand, and the State is bound by it, however inexpedient or injudicious it may have been

when made. By the Constitution of the United States no State can pass any law impairing the obligation of contracts." The opinion then proceeds on the theory that there was no contract because there was no consideration for one. There being no contract we held the assembly had no power to grant the University an irrevocable or irre- pealable exemption from taxation. On appeal to the United States Supreme Court that court found that there was a consideration for the granting of the charter and therefore there was a valid contract which could not be impaired under the Federal Constitution by any species of state legislation.

We should observe there was a companion case similar in all re- spects and considered at the same time brought by The Home of the Friendless against Rowse for the same relief. [See 42 Mo. 361.] In this court the opinion ruling both cases was written in the University case while in the United States Supreme Court the principal opinion was handed down in The Home of the Friendless case.

We certified both cases to the United States Supreme Court on the ground, as stated by that court (75 U. S. 1. c. 432), "there was neces- sarily drawn in question the construction of that clause of the Con- stitution of the United States, which prohibits a State from passing a law impairing the obligation of a contract, and that the decision was against the right claimed by the complainant, and was necessary to the adjudication of the cause; thus bringing the case clearly within the twenty-fifth section of the Judiciary Act, which gives to this court in such cases a power to examine and affirm or reverse the decision of the State Court."

Under Article III of the Federal Constitution jurisdiction of cases arising under the Constitution is vested in the Supreme Court on appeal under such regulations as Congress shall make. The appeal in these two cases, as pointed out, came under the provisions of Section 25 of the Judiciary Act (1789), 28 U. S. C. A., Sec. 344.

In this situation it would be absurd to say that the United States Supreme Court is bound by the decision of this court when that very decision is under review on appeal. While it is true the United States Supreme Court in such cases will generally defer in cases of doubt to the decision of a state court in the latter's interpretation of the statutes of its own state, nevertheless its unbroken line of decision establishes the rule that it will form its own judgment as to the existence and construction of the alleged contract. "Of what use would the appellate power (of this court) be to the litigant who feels himself aggrieved by some particular State legislation, if this court could not decide, independently of all adjudication by the Supreme Court of a State, whether or not the phraseology of the instrument in controversy was expressive of a contract and within the protection of the Constitution of the United States, and that its obligation should be enforced, notwithstanding a contrary conclu-

sion by the Supreme Court of a State? It never was intended, and cannot be sustained by any course of reasoning, that this court should, or could with fidelity to the Constitution of the United States, follow the construction of the Supreme Court of a State in such a matter, when it entertained a different opinion." [Jefferson Branch Bank v. Skelly, 66 U. S. 436 at 443.]

This rule has been reaffirmed in two decisions handed down since the Erie case, viz., Higginbotham v. Baton Rouge, 306 U. S. 535, and American Toll Bridge Co. v. Railroad Comm. of California, 307 U. S. 486. For other applications of the rule see the cases cited in these two decisions.

There can be no question but that the decision of the United States Supreme Court in the University's case against Rowse is today the law and is commandingly decisive of this case. We must abide by it now as we did in Washington University v. Baumann. We reaffirm our decision in that case where we said: ". . . the University has a contractual charter with the State, and that contract under the decision of the United States Supreme Court in the Washington University Case cannot be impaired by subsequent legislation. It stands superior not only to our present taxing law, but even to our Constitution insofar as they purport to destroy the University's privileges and immunities thereunder, relied on for years by it and at least some of its benefactors, as the evidence shows. To do so would be to commit a fraud."

■ Being of this mind it is not necessary to discuss other points raised by appellants about the wisdom of granting such a charter. In many instances the power to do so was abused so that it has since been abolished or cautiously guarded. But under the protection of the Federal Constitution even grants which turned out to be improvident are beyond the reach of the State. In this instance however it cannot be said that the grant was improvident. When it was made the Constitution provided that "schools and means of education shall forever be encouraged." [Const. 1820, Art. VI, Sec. 1.] The Legislature properly deemed the purposes for which the University was organized to be beneficial to the people. Here were a group of public-spirited and unselfish men generously seeking to establish an educational institution at private expense which to some extent would relieve the State in that field. Laws for the creation of a university supported by the State had been adopted only fourteen years before. It was the burdensome obligations on the State arising from "a false and ruinous system of loaning its credit to corporations, by which it incurred an immense debt" and from the conditions following the civil war all calling for exceedingly onerous taxation which brought about the all-inclusive change of policy through the restrictions in the 1865 Constitution. [42 Mo. l. c. 326.] At the same time the principle that education was essential to the preservation

of our rights and liberties was reasserted (Const. 1865, Art. IX) and it was again later in the Constitution of 1875 (Art. XI). Verily the same is true today.

The University pleaded and proved two grounds for relief. First, its charter exemption and second, the doctrine of *res judicata.* The decree of the trial court in favor of the University was based exclusively on the ground that the charter of the University exempted it from taxation. There is no mention, naturally, of *res judicata* in appellants' motion for new trial nor did the University appeal from the decree because of the court's failure to rule on this contention. While we find the University's plea of *res judicata* is upheld by the decisions in Kansas City Exposition Driving Park v. Kansas City, 174 Mo. 425, 74 S. W. 979, and North St. Louis Gymnastic Society v. James Hagerman, Jr., 232 Mo. 693, 135 S. W. 42, we cannot pass upon it because it is not before us.

The judgment is affirmed. All concur.