## HOWARD UNIVERSITY v. DISTRICT OF COLUMBIA.

### No. 9137.

United States Court of Appeals
District of Columbia.

Argued Feb. 8, 1946.

Decided March 18, 1946.

Mr. George E. C. Hayes, of Washington, D. C., for petitioner.

Mr. G. C. Updegraff, Asst. Corporation Counsel, District of Columbia, of Washington, D. C., with whom Messrs. Vernon E. West, Corporation Counsel, and Chester H. Gray, Principal Asst. Corporation Counsel, both of Washington, D. C., were on the brief, for respondent.

Before GRONER, C. J., and CLARK and PRETTYMAN, JJ.

GRONER, C. J.

Petitioner asks us to review and reverse an order of the District of Columbia Board of Tax Appeals.

The controversy involves the validity of an assessment of taxes for the fiscal year 1945 against real estate owned by Howard University.

The University was created by Act of Congress approved March 2, 1867.[1] The Act established "in the District of Columbia, a university for the education of youth in the liberal arts and sciences, under the name * * * of 'The Howard University.'" The incorporators are declared to be a body politic and corporate, with perpetual succession, and with the right to take to themselves and their successors, for the use of the University, any lands, moneys and effects by gift, devise, grant and sale, and to receive the rents, issues and profits, income and interest, and to apply the same for the proper use and benefit of the University. The incorporating Act contains no specific provision for exemption from taxation, but in 1882[2] Congress, in consideration of the conveyance to the United States of certain lands then held by Howard University (since reconveyed), provided: "That the property, real and personal, of the said University shall be exempt from taxation so long as such property shall be used only for the purposes set forth in the charter of said institution: * * *."

The record shows that from time to time Howard University has secured large grants of money from the United States for the purchase of lands, the construction of buildings, the maintenance of its plant, and for educational activities. None of such properties are involved in this controversy. In the seventy odd years of its existence Howard has grown to be one of the nation's leading Negro educational institutions of higher learning, its student body being drawn from practically every State of the United States and many foreign countries. Its outstanding contribution in its particular field is universally recognized.

[1] 14 Stat. 438, as amended May 13, 1938, 52 Stat. 351.

[2] Act of June 16, 1882, c. 222, § 3, 22 Stat. 105, D.C.Code, 1940 ed., § 47—811.

In 1929 its Board of Trustees, realizing the necessity of provision for future expansion, established what is now known as the "Twenty-Year Plan Extension Fund," and to this fund in that year, at the solicitation of the University, the General Education Board and the Julius Rosenwald Foundation contributed approximately $900,000.

With these donations and the resulting increment the University had acquired by July 1, 1944, real estate of the approximate value of $1,100,000, of which a little less than one-third had been "appropriated to the direct educational purposes of petitioner." Such appropriated properties, together with some $84,000 of other real estate holdings which were in the tax year vacant and non-productive of income, were not taxed, and are not involved. The real estate investment which is involved is located in proximity to the University campus and consists of dwelling houses, stores and apartments, from which Howard receives a considerable sum of money in rentals, the net proceeds of which, under the Extension Plan, have gone into a fund, and is used only in the purchase of additional property. The plan contemplates an ultimate fund of $15,000,000, to be expended in the erection of buildings on the lands in question for use in connection with the University's educational activities.

In addition to the land and buildings acquired under the "Plan," the University owns other pieces of improved real estate acquired from "Endowment Funds." These properties are not specifically designed for use in future extensions to the University, but are rented to various tenants and the income is used for the payment of salaries, scholarships and other expenses in the operation of the University.

In August, 1944, the Assessor of the District of Columbia imposed a tax assessment of $5,662.42 for the fiscal year ending June 30, 1945, against the improved properties carried in the Extension Plan and a tax of $1,152.72 against the same class of properties carried in the Endowment Fund. All of the involved properties were at the time rented to private tenants by the University.

In 1942 [3] Congress passed a comprehensive Act in relation to the exemption from taxation of real property in the District of Columbia. The Act exempts, *inter alia,* property belonging to hospitals, churches, cemeteries, libraries, schools, colleges and universities, provided, however, that if such properties, or any part thereof, are used to secure a rent or income for any activity other than that for which the exemption is granted, such property shall be assessed for taxation. The Act likewise exempts "property heretofore specifically exempted from taxation by any special Act of Congress, in force December 24, 1942, so long as such property is used for the purposes for which such exemption is granted."

It is under this last clause that the claim for exemption is made. Both parties agree that the result depends upon whether the real estate upon which the assessment is levied, and which admittedly is now being used only for the purpose of securing income from rents, is under the exemption provision of the 1882 Act, property "used only for the purposes set forth in the charter" of the University, i. e., "the education of youth." Counsel for the University says the question should be answered in the affirmative because, as he insists, the primary purpose in the acquisition of these properties was educational. Counsel for the District, to the contrary, contend that since the statute exempts property of the University *used only* for the education of youth, and where, as here, it is used to acquire income and not physically used for educational purposes, the exemption does not apply.

██ This brings us, then, to the question whether the property here is *used only* for "the education of youth in the liberal arts and sciences," for that, as all agree, is the stated purpose of incorporation. The precise problem has not heretofore been raised or decided in this jurisdiction, but the vastly preponderating weight of authority elsewhere, under tax exemption statutes similar, or so nearly similar as to amount to the same thing, is that exemption from taxation is not allowable when the property is rented for income, even though the income is, or is to be, devoted (indirectly) to educational purposes. In short, that it is the use to which *property* is put and not the use to which the *profits* from its use are put which determines the right to exemption. And to this, perhaps, should be added that it is the *present* use and not the intended use in the future which is controlling. The basis to sustain such a holding is sometimes said to be that when

---

[3] 56 Stat. 1089, D.C.Code, 1940 ed., Supp. IV, §§ 47—801a to 801f.

a literary, or religious, or scientific association enters the common business of life and uses its property for the accumulation of money, it should be treated no differently than those regularly engaged in the business. For this reason, it is said, "the law looks to the property as it finds it in use, and not to what is done with its accumulations." Young Men's Christian Ass'n v. Douglas County, 60 Neb. 642, 83 N.W. 924, 927, 52 L.R.A. 123. The cases holding to this effect are so numerous that it would unduly lengthen this opinion to name them. It is enough, we think, to point to 2 Cooley, Taxation, 4th Ed. 1924, §§ 686, 687; 34 A.L.R. 659; 108 A.L.R. 292, and 51 Am.Jur., Taxation, § 621, where the cases may be found, and in the interest of reasonable brevity to say only that they reflect the established law in a large majority of the States to be that where "the statute makes the exemption depend upon the use of the property,"—as is the case here—the rule is that the exemption does not apply to property rented to others.

In the present case the record shows, as we have pointed out, that the income from the properties under the Extension Fund is used to accumulate funds for the purchase of additional property, and only the smaller amount of income from the properties purchased out of the Endowment Fund is actually used for educational purposes, but in neither case is the *property* itself used *only,* that is to say, exclusively, "for the education of youth." This, as the Board found, condemns the claim, and in this conclusion we are in complete accord.

In reaching this result we have not overlooked cases cited by counsel for the University which, it is asserted, compel a different conclusion. The case most earnestly urged is Northwestern University v. People, 99 U.S. 309, 25 L.Ed. 387. That was an appeal from the Supreme Court of Illinois, and the facts in relation to the properties sought to be taxed are strikingly like those here. There, as here, there was an educational institution, chartered by the State, which had purchased parcels of improved lands which it rented, the income from which was either presently used or ultimately to be used for purposes which might be considered as educational. But there the resemblance ceases. The charter of Northwestern, granted in 1851, under the Illinois Constitution of 1848, provided "That all property of whatsoever kind or description," belonging to the University "shall be forever free from taxation for any and all purposes," thus calling for the application of the so-called "ownership test," which is wholly different from the "use test." In 1870 a new constitution was adopted in Illinois and it was under its provisions that the tax was sought to be imposed. The question was whether the exemption in the charter was a contract and accordingly whether the tax impaired its obligations. The Supreme Court, contrasting the applicable provisions of the old and the new constitutions, reached the conclusion that the later law was designed to limit the more enlarged powers of the earlier one, and held that in the circumstances the attempted imposition of the tax impaired the contract, and on that ground reversed the State court.

In the comparatively recent case of Trinidad, Insular Collector, v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458, the Supreme Court upheld the exemption from income taxation of an ancient religious society in the Philippines under a law exempting net income of any corporation "organized and operated exclusively for religious * * * purposes, no part of the net income of which inures to the benefit of any private stockholder or individual." But obviously, under that provision, the test of exemption was the use of the income, and it having shown that the income was used exclusively in promoting religious purposes, rents, dividends and interest received by the society were nontaxable.

Washington University v. Rouse, 8 Wall. 439, 19 L.Ed. 498; Washington University v. Baumann, 341 Mo. 708, 108 S.W.2d 403; St. Anna's Asylum v. City of New Orleans, 105 U.S. 362, 26 L.Ed. 1128; Chicago Home for Girls v. Carr, 300 Ill. 478, 133 N.E. 344, all involve statutes which provided exemption from taxation without regard to the use made of the property.

In Vanderbilt University v. Cheney, 116 Tenn. 259, 94 S.W. 90, and Woonsocket Hospital v. Quinn, 54 R.I. 424, 173 A. 550, the Tennessee and Rhode Island courts, on facts more or less similar to those in the present case, reached a conclusion different from that reached by us. But, as we have already seen, the reasoning to sustain these conclusions, in addition to being in conflict with the general trend of decisions elsewhere, does not commend itself to us.

We accordingly affirm the order and decision of the Board.

Affirmed.